**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| **SPORT & WHEAT CPA PA**,<br>a Florida corporation, individually and<br>on behalf of a class of similarly situated<br>businesses and individuals,<br><br>     Plaintiff,<br><br>   *v.*<br><br>**SERVISFIRST BANK INC.;**<br>**SYNOVUS BANK;**<br>**THE FIRST, A NATIONAL**<br>**BANKING ASSOCIATION; and**<br>**TRUIST BANK,**<br><br>   Defendants. | Case No. 3:20-cv-5425-TKW-HTC |

### SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff Sport & Wheat CPA PA ("Sport & Wheat") now brings this

amended complaint. Sport & Wheat is a small accounting firm that assisted several

small businesses with applying for loans in the federal "Paycheck Protection

Program," an emergency initiative of the Small Business Administration that was

intended to dispense hundreds of billions of dollars through bank loans to keep the

U.S. economy afloat.

Sport & Wheat worked hard—and at lightning speed—to help its clients file

loan applications, which the Defendant banks relied upon in making their loans.

1

The Defendant banks benefited from Sport & Wheat's advance work, and they were aware of it. But they did not pay a dime for it, despite federal law requiring them to.

This action is on behalf of Sport & Wheat and all similarly situated agents who helped borrowers access the Paycheck Protection Program, but were uncompensated for the hard work they did.

### TABLE OF RELEVANT AUTHORITIES

The following authorities are especially relevant to resolution of this action. For ease of consultation, Sport & Wheat sometimes uses these more familiar names, rather than the full citations.

| Familiar Name Used in this Complaint | Formal Citation |
|---|---|
| CARES Act. | Pub. L. No. 116-136. |
| Paycheck Protection Program. | Section 1102 of the CARES Act; 15 U.S.C. § 636(a)(36). |
| PPP Interim Final Rule. | 85 Fed. Reg. 20811. |
| The SBA's Section 7(a) lending program. | Section 7(a) of the Small Business Act, Pub. L. No. 85-536, as amended; now codified at 15 U.S.C. § 636(a). |

Formatted Table

2

**INTRODUCTION**

1. As part of its response to the COVID-19 pandemic, Congress created the Paycheck Protection Program (the "PPP"), to provide emergency loans to small businesses.

2. The PPP was initially enacted in the Coronavirus Aid, Relief, and Economic Security Act, also known as the CARES Act, which was signed into law on March 27, 2020. The initial round of funding was $349 billion. The PPP was replenished on April 24, 2020 when Congress added another $310 billion to the available pool.

3. The PPP, one of the CARES Act's core programs, is a program which offers loans of up to $10 million to businesses with fewer than 500 workers. It was designed to assist small businesses in keeping their employees on the books and the businesses intact during the worst part of the national shutdown.

4. The PPP's enabling statute generally provides that if a small business uses a PPP loan to continue paying its employees, most or all of the loan will be forgiven. The PPP represents a direct injection of federal cash into the economy.

5. The U.S. Small Business Administration ("SBA") administers the PPP.

6.      Congress decided to channel PPP money through the Small Business Administration, rather than setting up an entirely new federal bureaucracy, because that was the fastest way to accomplish the goal of getting money into the hands of small businesses and their employees.

7.      In these circumstances, the SBA does not make loans directly to small businesses. Rather, the SBA serves as a guarantor for banks and other financial institutions who ultimately make the loans. The flow of the funds between relevant entities looks like this:



8.      Lenders that make PPP loans receive an origination fee equal to a percentage of each loan amount. There is a sliding scale, such that the smallest loans come with the largest percentage fees.

9.      These fees are paid directly to lenders by the SBA and are earned when the loan is originated. Lenders may still earn additional money—interest—on top of these fees. All of the risk is borne by the federal government.

4

10. Congress has long understood that some small business borrowers need the assistance of accountants, attorneys, or other financial professionals to assemble, prepare, process, and file their PPP loan applications. These professionals are known as "agents."

11. Sport & Wheat, itself a small business, is a Pace, Florida-based accounting firm that acted as an agent under the PPP.

12. The PPP regulations incentivize agents to provide assistance to borrowers. It states that agents' fees *will be* paid by the lender, out of the origination fees the lender receives from the SBA.

13. And, to ensure that all PPP loan money goes toward supporting small business, the relevant rule further provides that agents *may not* collect fees from the borrower, or from PPP loan proceeds.

14. Thus: agents were contemplated to be part of the PPP process; lenders' fees are the only intended source of compensation for agents; and lenders—who agreed to these rules by participating in the PPP—know all this.

15. Each of the Defendants participated in a transaction with a borrower, with Sport & Wheat acting as agent. Notwithstanding the clear Congressional intent of the PPP, each of the Defendants has refused to pay Sport & Wheat the fees it is entitled to as an agent.

5

16.     Defendants' refusals cite their own generally applicable policies, meaning that Defendants are also refusing to pay other members of the class this action seeks to represent.

17.     As a result of Defendants' policies, thousands of CPAs and other agents are not being compensated for their work.

18.     The CARES Act embodies "the sense of the Senate," that the Paycheck Protection Program should "prioritize" loans to "small business concerns and entities in underserved and rural markets, including veterans and members of the military community, small business concerns owned and controlled by socially and economically disadvantaged individuals . . . , women, and businesses in operation for less than 2 years." 15 U.S.C. § 636(a)(36)(P)(iv).

19.     Defendants' policies violate that provision too. They unjustly discriminate against the smallest of small businesses. The smallest businesses are, on the whole, less financially sophisticated and less likely to have in-house accountants—and therefore more likely to need the services of an agent to successfully apply get a PPP loan. By refusing to compensate agents, Defendants are choking off access to funds for the least sophisticated of enterprises.

20.     Defendants' unlawful policies have hurt the smallest businesses in yet another way: while the pool of funds was enormous, it was not unlimited. The

6

initial $349 billion ran out within days, which is why Congress replenished the funds with another $310 billion. According to the SBA's May 8, 2020 report, that money is quickly running out. Small businesses that need these funds don't have endless time to navigate the system. Without the help of an agent, the smallest of businesses will be unable to get a fair shot at the funds before they dry up.

21.     Defendants' policies are unlawful and run counter to Congress's stated intent: keeping small businesses afloat during this terrible economic time. And Defendants' policies violate federal law. Sport & Wheat seeks redress on behalf of itself and the class.

## JURISDICTION AND VENUE

22.     This Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which: (1) at least some members of the proposed class have different citizenship from any Defendant; (2) the proposed class consists of more than 100 persons or entities; and (3) the claims of the proposed class Members exceed $5,000,000 in the aggregate.

23.     This Court also has original jurisdiction under the general federal question statute, 28 U.S.C. § 1331, because this action arises under the laws of the United States.

7

24.     This Court has personal jurisdiction over each of the Defendants because they do business in this district, including with their own borrowers, they direct their business activities with Sport & Wheat into this district, and a substantial number of the events or omissions giving rise to the claims took place in this district.

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this district. Specifically, Sport & Wheat performed its work in this district, for borrowers residing in this district, who applied for PPP loans from the Defendants while in this district, and Defendants marketed, promoted, and accepted applications for PPP loans in this district.

## PARTIES

26.     Plaintiff Sport & Wheat, CPA, PA is a Florida corporation with its principal place of business in Pace, Florida.

27.     As used in this complaint, a "Borrower" means one of several clients of Sport & Wheat that applied for and received a PPP loan from one Defendant (or more generally, any business who received a PPP loan from a Defendant by using the services of a class member).

8

28.     Defendant ServisFirst Bank, Inc. is a Florida for-profit corporation with its principal place of business in Birmingham, Alabama.

29.     Defendant Synovus Bank is a Georgia for-profit corporation with its principal place of business in Columbus, Georgia.

30.     Defendant The First, A National Banking Association ("TheFirst") is a national banking association headquartered in Hattiesburg, Mississippi.

31.     Defendant Truist Bank is a North Carolina for-profit corporation with its principal place of business in Charlotte, North Carolina.

## THE COVID-19 CRISIS
## BEGINS HITTING SMALL BUSINESSES IN AMERICA

32.     Small businesses are the backbone of the American economy. Indeed, about half of America's workers work at a small business. These businesses and their employees have been hit hard by the global COVID-19 outbreak.

33.     On March 11, 2020, the COVID-19 outbreak was characterized as a pandemic by the World Health Organization. Most countries of the world adopted travel restrictions and stay-at-home policies in order to slow the spread of COVID-19 and "flatten the curve" so as to not overwhelm the health sector's capacity to treat patients.

34.     On March 13, 2020, President Trump issued a proclamation declaring a national emergency concerning the COVID-19 pandemic. A combination of

9

federal, state, and private actions led to the closure of large sectors of the economy, with the effect of throwing millions of small businesses into jeopardy.

35.     The President and the Congress quickly understood the need for economic support in the face of the pandemic.

36.     On March 25, 2020, in response to the COVID-19 crisis, the United States Senate passed the Coronavirus Aid, Relief, and Economic Security Act—the "CARES Act." The Act passed the House the next day, and it was signed into law as Pub. L. No. 116-136 on March 27, 2020.

37.     At President Trump's signing of the CARES Act, U.S. Rep. Steve Chabot, ranking member of the House Small Business Committee, praised the legislation as giving small businesses a great chance to reopen.[1] Florida's U.S. Senator, Marco Rubio, chair of the Senate Small Business and Entrepreneurship Committee, stated that the "bipartisan small business package . . . will provide emergency relief so that millions of American workers can keep their jobs and millions of small businesses can stay open."[2] The Senate Majority Whip, John

---

[1] *Remarks by President Trump at Signing of H.R. 748, The CARES Act*, The White House (*available at* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-signing-h-r-748-cares-act/).

[2] Press Release, Sen. Rubio, *Rubio Applauds Passage of Phase 3 Coronavirus Emergency Relief Bill* (Mar. 25, 2020) (*available at* https://www.rubio.senate.gov/public/index.cfm/press-releases?ContentRecord_id=D08E8A75-546A-4C56-A890-B948048E9B5C).

Thune, stated that the PPP loans provided by the CARES Act "will deliver relief to small businesses to help them and their workers weather this storm."[3]

38.   The CARES Act poured trillions of federal dollars into the economy. Unprecedented in size and scope, the legislation was the largest economic stimulus package in U.S. history, amounting to 10% of the total U.S. gross domestic product.

### THE CARES ACT AND
### ITS INTERSECTION WITH EXISTING SBA LAW

39.   Congress created the Paycheck Protection Program in Section 1102 of the CARES Act.

40.   Rather than setting up an entirely new federal bureaucracy, and recognizing the need to act quickly, Congress decided to route these loans through the Small Business Administration and its existing network of private lenders.

41.   The Small Business Administration was created by Congress in 1958 with the passage of the Small Business Act, Pub. L. No. 85-536. Its stated aim was to "aid, counsel, assist, and protect . . . the interests of small-business concerns . . . to maintain and strengthen the overall economy of the Nation." *Id*.

42.   Section 7(a) of the Act allowed the SBA to make loans to small businesses. This section has been amended over the years and is presently codified

---

[3] Press Release, Sen. Thune, *Thune Statement on Senate Passage of Bipartisan Coronavirus Relief Package* (Mar. 25, 2020 (*available at* https://www.thune.senate.gov/public/index.cfm/press-releases?ID=CA914CF0-5C3D-4A02-B6F2-84925B5467BD).

at 15 U.S.C. § 636(a). Over the decades and in partnership with private lenders, the SBA's Section 7(a) program has supported companies employing millions of Americans.

43.    In sum, Section 1102 of the CARES Act is the section that created the Paycheck Protection Program, and Section 1102 amends Section 7(a) of the SBA's enabling act.

44.    Most of Section 1102 was codified at 15 U.S.C. § 636(a)(36).

45.    Acting under its rulemaking authority over the years, the SBA has written regulations which govern the implementation of the Section 7(a) program.

46.    As discussed below, the SBA also enacted regulations to implement the PPP statute. These regulations are different and override elements of the Section 7(a) regulations.

**THE PAYCHECK PROTECTION PROGRAM'S DESIGN**

46.47. The PPP gives American small businesses with eight weeks of cash flow assistance through federally-guaranteed loans with a short term of two years and a low interest rate. Under the PPP, the SBA guarantees private lenders' loans.

47.48. One of the most important aspects of the PPP is that if a company retains its workforce for a period of time, the loans are forgiven. Congress set such generous terms because its primary goal was keeping Americans paid.

12

48.49. The PPP was intended to be extremely generous to lenders, so that they would rapidly disburse the billions in federal funds through the economy.

49.50. One of the ways the PPP does this is by paying lenders an origination fee—either 1%, 3%, or 5%—based on the size of the loans. 15 U.S.C. § 636(a)(36)(P)(i).

50.51. Lenders are not necessarily permitted to retain the entire origination fee for themselves, however. Under the PPP statute and its implementing rule, this fee must be divided with an "agent," such as Sport & Wheat, when the agent assists with a loan transaction.

51.52. As used hereafter in this complaint, "PPP Agent" specifically means a person who acted as an agent to assist a Borrower in applying for a loan under the Paycheck Protection Program.

52.53. The statute, 15 U.S.C. § 636(a)(36)(P)(ii), sets a cap on PPP Agents' fees, as follows:

> **(ii) Fee limits.—**
> An agent that assists an eligible recipient to prepare an application for a covered loan may not collect a fee in excess of the limits established by the Administrator.

53.54. Accordingly, how a PPP Agent can collect a fee, and how much, is a decision Congress expressly delegated to the Small Business Administration.

13

54.55. The SBA exercised its rulemaking authority under this and other provisions of the Paycheck Protection Program statute, issuing the PPP Interim Final Rule on April 2, 2020, making it effective April 15, 2020. 85 Fed. Reg. 20811.[4]

56.     The PPP Interim Final Rule overrode conflicting rules from the "old" Section 7(a) lending program. It did so expressly and impliedly. One way it did so is by including express statements, like: "The program requirements of the PPP identified in this rule temporarily supersede any conflicting Loan Program Requirement (as defined in 13 CFR 120.10)." Another way it did so is by establishing rules that implement the PPP statute, but are incompatible with the old Section 7(a) program.

57.     Accordingly, there are special PPP-only rules that apply to the relationship of all PPP participants (lenders, borrowers, and agents).

55.58. As relevant here, the PPP Interim Final Rule provides:

> c. Who pays the fee to an agent who assists a borrower?
>
> **Agent fees will be paid by the lender out of the fees the lender receives from SBA. Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds.** The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed:

---

[4] *Available at* https://www.sba.gov/sites/default/files/2020-04/PPP%20Interim%20Final%20Rule_0.pdf.

       i. One (1) percent for loans of not more than $350,000;

       ii. 0.50 percent for loans of more than $350,000 and less than $2 million; and

       iii. 0.25 percent for loans of at least $2 million.

       The Act authorizes the Administrator to establish limits on agent fees. The Administrator, in consultation with the Secretary, determined that the agent fee limits set forth above are reasonable based upon the application requirements and the fees that lenders receive for making PPP loans.

85 Fed. Reg. 20811, 20816 (emphasis added).

    ~~56.~~59. The U.S. Treasury also distributed a fact sheet for lenders in connection with this rule. *Paycheck Protection Program (PPP) Information Sheet*, U.S. Treasury.[5] As relevant in the Treasury's fact sheet:

       **How will agents be compensated? Agent fees will be paid out of lender fees. The lender will pay the agent.** Agents may not collect any fees from the applicant. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed:

- One (1) percent for loans of not more than $350,000;

- 0.50 percent for loans of more than $350,000 and less than $2 million; and

- 0.25 percent for loans of at least $2 million.

---

[5] *Available at* https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf.

15

(Some emphasis added.)

Formatted: Font: Times New Roman

~~57.~~60. The PPP was in such high demand that its initial $349 billion allotment was exhausted after just fourteen days. Congress has followed on with ~~a supplement, and on April 24, 2020, the President signed H.R. 266, the Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, into law. This second act authorized an additional $310 billion in funding for the Paycheck Protection Program.~~supplemental authorizations. Other than making additional money available, ~~this statute is~~they are not independently significant to the claims in this action.

### THE ROLE OF PPP AGENTS IN
### THE PAYCHECK PROTECTION PROGRAM

~~58.~~61. It has been a longtime practice under Section 7(a), the small business lending program, for lenders and borrowers to rely on the services of "agents." "Agents" are entities like accounting firms, bookkeepers, and other financial professionals who help borrowers navigate the Small Business Administration's complex processes and the landscape of the SBA lending program, and who help lenders by feeding them completed loan packages.

~~59.~~62. Agents are especially important for the smallest of small businesses— who do not have such professionals in house.

16

60.63. In the context of the PPP, agents gather financial documents, explain the law, prepare loan applications, and shepherd those applications through banks' processes to completion. Agents may also assist with helping borrowers obtain the critical loan forgiveness later on.

61.64. In the context of the Section 7(a) program, "Agent" hashad a specific regulatory definition, which can be found at 13 CFR § 103.1(a):

> (a) Agent means **an authorized representative, including an attorney, accountant, consultant, packager, lender service provider, or any other individual or entity representing an Applicant** or Participant by conducting business with SBA. For purposes of SBA's business loan programs, the term Agent includes but is not limited to:
>
> . . .
>
> (2) Packager: **An Agent who prepares the Applicant's application for financial assistance and is employed and compensated by the Applicant.**
>
> (3) Loan Broker (also known as Referral Agent): an Agent who, on a specific transaction, either assists the Applicant in finding an SBA Lender that will be willing to make a loan to the Applicant or assists the SBA Lender in finding an Applicant. A Loan Broker may be employed and compensated by either the Applicant or the SBA Lender (but not both). Compensation paid to a Loan Broker by an SBA Lender may not be passed on to the Applicant and may not be paid out of SBA–guaranteed loan or debenture proceeds.

13 CFR § 103.1(a) (emphasis added).

**Formatted:** Font: Times New Roman

62.65. The Treasury's fact sheet uses a similar definition of "agent," specifically in connection with the PPP.[6]

66.    In this context, Sport & Wheat acted as an "agent," in the sense that it was a borrower's "authorized representative . . . representing an Applicant"—namely, Sport & Wheat's clients, the Borrowers.

67.    Each Borrower authorized Sport & Wheat to represent it in connection with procuring PPP loans, the details of which are discussed in sections below.

68.    Each Borrower agreed to pay Sport & Wheat—its longtime accounting firm on other matters—for the value of its time spent on PPP transactions

63.69. Before the Paycheck Protection Program,—that is, in the "old" Section 7(a) lending program—an agent could charge a borrower for his or her services. An agent involved in a transaction and receiving a fee, but was required to take certain administrative steps, including filing a compensation agreement on aan SBA form created by the SBAthat gave disclosure of the Agent's role to the Lender and Borrower. 13 CFR § 103.5(a). Each agreement "govern[ed] the compensation charged for services rendered or to be rendered to the Applicant or lender in any matter involving SBA assistance." SBA callscalled this "Form 159." (Ex. A.)

---

[6] *Paycheck Protection Program (PPP) Information Sheet*, U.S. Treasury, *available at:* https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf.

~~64.~~70. The PPP Interim Final Rule modified this procedure. Under that rule, a PPP Agent's fee is to be paid from the lender's origination fee.

~~65.    Harmonizing these provisions, a Borrower may agree to hire a PPP Agent, subject to the fee caps set by the SBA in its PPP Interim Final Rule; and to be paid under 13 CFR § 103.5(a), the PPP Agent must submit the arrangement in writing on SBA's Form 159.~~

~~66.    The SBA has another relevant regulation, 13 CFR § 120.195. This regulation requires Borrowers to identify "agents" who assisted them in obtaining a loan, describe the work performed, and describe the fee to be paid.~~

~~67.    Under this provision, any Defendant who accepted a loan application from a Borrower involving Sport & Wheat must have assured itself that Sport & Wheat was identified on the loan application, along with its work performed and the fee to be paid.~~

71.    ~~Sport & Wheat acted as a PPP Agent with respect to each Defendant on at least one Borrower's transaction, the details of which are discussed in sections below.~~ The PPP Interim Final Rule says nothing about obtaining the lender's approval in advance of payment to a PPP Agent.

72.    The PPP Interim Final Rule also does not say that Form 159 needs to be used.

19

73.     In short, the PPP Interim Final Rule has repealed these conflicting parts of Section 7(a)'s background rules.

1.     Each Borrower agreed to pay Sport & Wheat—its longtime accounting firm on other matters—for the value of its time spent on PPP transactions.

68.74. Each of the Defendants here knew that their Borrowers had utilized the services of Sport & Wheat as a PPP Agent. When each Defendant was asked to compensate Sport & Wheat, each Defendant refused. Those circumstances are also detailed below.

69.75. Each Defendant refused to permit Sport & Wheat from collecting the money it earned, and in refusing to do that, each Defendant violated the law.

70.76. In part, each Defendant did that by (1) refusing to list accept Sport & Wheat as a PPP Agent, even though it was authorized to act as such by a Borrower; (2) actually removing Sport & Wheat's name from PPP loan documents, including applications, or (3) ordering Borrowers to remove Sport & Wheat's name and signature from submitted applications—all in violation of law. The circumstances of these acts are also detailed below.

71.77. At all times, Sport & Wheat intended to be compensated for its work, and intended to comply with all provisions of law necessary to be lawfully compensated.

20

78.     Sport & Wheat's only permissible source of compensation, under the PPP statute and its implementing rule, is the ~~Defendants'~~ statutorily-created origination fees. These fees were intended to be divided with Sport & Wheat. It is of no moment that they passed through the Defendants' hands first.

~~72.~~79. Defendants are now liable to Sport & Wheat because they acted with full knowledge of the relevant federal laws and accepted the benefit of Sport & Wheat's services.

## FACTUAL ALLEGATIONS SPECIFIC TO SPORT & WHEAT'S INTERACTION WITH EACH DEFENDANT

~~73.~~80. Sport & Wheat is a CPA firm located in Pace, Florida. It has approximately 1,000 clients, approximately 200–250 of which are small businesses or sole proprietorships. It provides accounting and tax services.

~~74.~~81. Like many CPA firms around the country, Sport & Wheat realized that many of its small business clients likely would be applying for PPP loans. Accordingly, Sport & Wheat immediately began to study the law, regulations, and rules issued by the government, as well as guidance from CPA societies, banks and other recognized authorities.

~~75.~~82. Due to the extremely quick passage of the law and the knowledge that the funds would likely run out after being given on a "first come/first served" basis,

21

Sport & Wheat employees put considerable time into their research, and they set aside other opportunities for profitable work.

~~76.~~83. Sport & Wheat initiated contact with its hardest-hit small business clients to inform them of the PPP and to advise them that if a PPP loan was used to keep its employees employed during the pandemic, all or a substantial portion of that loan would be forgiven.

~~77.~~84. Shortly after the PPP became public, Sport & Wheat was inundated with requests from its clients for assistance in applying for PPP loans, many of which were desperately trying to avoid laying off employees.

~~78.~~85. During March and April 2020, Sport & Wheat assisted approximately 50 clients in preparing, processing, and filing PPP loan applications.

~~79.~~86. ~~Some lenders have agreed to pay~~The transactions described below are just a subset of the transactions where Sport & Wheat ~~for its services.~~should have been compensated. They are examples of the pattern of conduct by Defendants~~, however, have refused~~.

**ServisFirst**

~~80.~~87. On April 2, 2020, Sport & Wheat was asked by one of its small business clients, "Borrower R," to assist it in applying for a PPP loan.

22

81.88. Borrower R is an engineering firm specializing in the design and manufacturing of equipment used by mechanics to repair vehicles. It is a Florida limited liability company. Borrower R has eight employees.

82.89. Due to the COVID-19 pandemic and the cessation of almost all of its business, Borrower R was considering furloughing a number of its workers.

83.90. In applying for a PPP loan with Defendant ServisFirst on behalf of Borrower R, Sport & Wheat expended 6.8 hours of time preparing, processing and filing the PPP loan application and supporting documents.

84.91. Sport & Wheat's work may continue even after Borrower R's loan is funded, helping .Borrower R prepare the necessary certifications in order for the PPP loan to be forgiven. This "back-end work" is part and parcel of Sport & Wheat's arrangement with its clients. The form for this work was recently released and runs eleven pages.

85.92. Between April 2, 2020 and April 7, 2020, Sport & Wheat prepared, signed as PPP Agent, hand-delivered, and e-mailed to Borrower R and ServisFirst different iterations of the PPP loan application and supporting documents.

86.93. Thus, ServisFirst was aware that Borrower R was working on the application.

23

87.94. On April 7, 2020, Borrower R filed its PPP loan application through ServisFirst's portal using the information and documents that Sport & Wheat had prepared. Borrower R requested a PPP loan in the amount of $94,165.

88.95. On or about April 10, 2020, ServisFirst funded the requested loan for Borrower R.

89.96. Based on the size of this loan, applying the formula in the Paycheck Protection Program, and on information and belief, ServisFirst will receive or has received its PPP loan origination fee of $4,708.25 (5% × $94,165).

90.97. ServisFirst is required under the SBA rule to pay Sport & Wheat's fees as Borrower R's PPP Agent. Under the rule, Sport & Wheat's fee can be as much as 1% of the loan, or $941.65.

91.98. On April 17, 2020, Borrower R asked ServisFirst about payment of Sport & Wheat's fees as Borrower R's PPP Agent.

92.99. ServisFirst advised Borrower R that "[t]he SBA guidance on charging the client fees changed late in the game. The Bank has made a decision to not pay agents."

93.100.     Borrower R communicated this to Sport & Wheat the same day.

94.101.     ServisFirst's representation that the SBA guidance "changed" is false. In fact, the PPP Interim Final Rule mandated that PPP "Agent fees will be

24

paid by the lender out of the fees the lender receives from SBA." That has not changed.

95.102.    Sport & Wheat has not been compensated by ServisFirst for its services as Borrower R's PPP Agent.

96.103.    Had Sport & Wheat not performed its work, ServisFirst would not have been able to fund this loan or earn its origination fee from the SBA.

97.104.    In addition to Borrower R, Sport & Wheat assisted, is presently assisting and may in the future assist other clients with their PPP loan applications with ServisFirst. Sport & Wheat expects to be paid for its services in connection with each loan, consistent with law.

### Synovus Bank

98.105.    On March 24, 2020, Sport & Wheat was asked by another small business client, "Borrower C," to assist it in applying for a PPP loan.

99.106.    Borrower C is a medical group in Pensacola, Florida that specializes in surgery. Borrower C has nine employees.

100.107.    Because the surgeries Borrower C performs for its patients are predominately elective, Borrower C's business had all but stopped due to the COVID-19 pandemic and it was considering furloughing its staff.

101.108.    Borrower C hired Sport & Wheat to prepare a PPP loan application intended to be submitted to Defendant Synovus Bank.

102.109.    Sport & Wheat expended 8.67 hours of time preparing, processing, and filing the PPP loan application and supporting documents. As with other clients, Sport & Wheat's help also will be needed with so-called "back-end work" to ensure that the loan is later forgiven.

110.    Sport & Wheat's principal and an employee at Synovus exchanged a number of text messages over the course of negotiating Borrower C's loan. (Ex. B.) These messages make clear that Synovus was aware of Sport & Wheat's role as an agent; sought its assistance; and thanked it for its help.

103.111.    On April 1, 2020, Sport & Wheat prepared a PPP loan application that Borrower C signed as the borrower, and that Sport & Wheat signed as its PPP Agent.

104.112.    On April 1, 2020, Sport & Wheat communicated with Synovus Bank, assisting Synovus Bank in resolving the bank's mismatching of Borrower C's name. This mismatch had caused a delay to Borrower C's application.

105.113.    Thus, by that point, Synovus Bank knew that Sport & Wheat was acting as Borrower C's PPP Agent in connection with Borrower C's PPP loan application.

26

114.    The text messages show a pattern of communication regarding the PPP program and Synovus's procedures. For example, on April 3, Sport & Wheat texted to say that the bank's PPP web site was up, to which the bank employee responded, "Thank you Jesus!!!!! 🙏🙏🙏🙏 " (Ex. B at 1.) On April 4, the parties discussed whether the bank would e-mail Sport & Wheat's clients about loan status. *Id.* at 5. Other communications from the bank to Sport & Wheat showed that "Yes they are processing," meaning Sport & Wheat's loans. *Id.* at 9.

115.    Synovus's employee effusively thanked Sport & Wheat for its help. *Id.* at 15.

116.    In the course of this program, Synovus was mobbed with business. The bank told Sport & Wheat that employees were "working all weekend," were "texting me at 10 last night," and had already processed 11,000 loan applications in the eight days since the President signed the PPP into law. *Id.* at 6, 10, 11.

117.    On April 5, Sport & Wheat texted to ask, "Has your day been crazy?" The bank employee responded: "Absofreakinlutely." *Id.* at 12. The day before, that same employee said she needed a spa break when the PPP rush was over. *Id.* at 4.

118.    This is consistent with the bank's own testimony under Rule 30(b)(6) in this case. (Ex. C, deposition excerpts.) The bank testified that it had assigned 400 people, just in customer-facing jobs, to handle PPP loans—with more

27

presumably behind the scenes. *Id.* at 49:24–50:8. Some of these people were working formal overtime hours. *Id.* at 50:9–13. In fact, a local bank vice president in Pensacola wrote to bank customers that the process was "stressful" and that bankers were "talking on the phone at 11:00 and 12:00 at night" with customers. 44:3–46:11. The corporate representative testified that this meant "tension and stress" for the bank. *Id.*

119.    The bank also testified that it would have benefited from receiving a "clean" PPP application, versus one with errors. *Id.* at 61:12–62:13. It agreed that this "would have freed up some labor resources to work on a different application, which would allow the bank to do more business." *Id.* at 62:14–23.

120.    A "clean" application is what Sport & Wheat provided to Synovus. Sport & Wheat's professional knowledge made the application process smoother and improved the bank's workflow.

121.    Accordingly, the bank—acting under these overloaded conditions—directly benefited from Sport & Wheat's help.

~~106.~~122.    On April 9, 2020, Sport & Wheat asked Synovus Bank about the payment of Sport & Wheat fees as Borrower C's PPP Agent. This communication is documented in a different set of text messages. (Ex. D.)

28

123.   Synovus ~~Bank advised Sport & Wheat that~~ Bank's manager wrote: "At this point Synovus ~~Bank had decided that it would~~has taken the position, right or wrong, that they are not ~~pay PPP Agents'~~paying the agent fees~~.~~." *Id.* at 2.

~~107.~~124.   Of course, this was *after* Synovus Bank had relied on Sport & Wheat's help, as described in the allegations above and the exhibits to this amended complaint.

125.   The manager also wrote: "This was a Columbus [headquarters] decision and was based on economics I suspect. I can't speculate but I think we might have paid them if the interest rate had stayed at 4% instead of 1%." *Id.* at 3.

~~108.~~126.   On April 17, 2020, Borrower C was able to access Synovus Bank's online portal to apply for a PPP loan in the amount of $163,303. Borrower C did so using the financial information and supporting documentation that Sport & Wheat had prepared.

~~109.~~127.   On April 21, 2020, Borrower C received the funds from its PPP loan as requested: $163,303.

~~110.~~128.   Based on the size of this loan, applying the formula in the Paycheck Protection Program, and on information and belief, Synovus Bank will receive or has received its PPP loan origination fee of $8,165.15 (5% × $163,303).

111.129.   Under the rules, Synovus Bank is required to share part of its fee with Sport & Wheat as Borrower C's PPP Agent. The maximum amount Sport & Wheat may receive under the PPP Interim Final Rule is $1,633.03 (1% × $163,303).

112.130.   Sport & Wheat has not been compensated by Synovus Bank for its services as Borrower C's PPP Agent.

113.131.   In addition to Borrower C, Sport & Wheat has assisted and will assist other clients with their PPP loan applications with Synovus Bank. Sport & Wheat expects to be paid for its services in connection with each loan, consistent with law.

### TheFirst

114.132.   On April 8, 2020, Sport & Wheat was asked by one of its small business clients, "Borrower I," to assist it in applying for a PPP loan.

115.133.   Borrower I is a single-member LLC in the business of pressure-washing, soft-washing, and roof cleaning. It is a Florida limited liability company with its principal place of business in Pace, Florida.

116.134.   Due to the COVID-19 pandemic, almost all of Borrower I's business had ceased.

30

117.135.     Sport & Wheat expended 1.8 hours of time preparing Borrower I's PPP loan application and gathering supporting documents. Sport & Wheat may also be required to provide assistance to Borrower I for back-end work.

118.136.     On April 9, 2020, Sport & Wheat prepared a PPP loan application and supporting documents. Sport & Wheat signed the application as PPP Agent in the space marked "Borrower's Agent," and e-mailed it to Borrower I. Borrower I then sent the application to Defendant TheFirst.

119.137.     On April 10, 2020, Borrower I was informed by TheFirst that the application needed to be redone, and that only Borrower I should sign the application—with Sport & Wheat's name removed. (Ex. E at 2.) Specifically, TheFirst's employee wrote: "this is okay except for Jill's signature. She is not an authorized agent for the bank therefore she should not sign. Please redo this form and only you sign it." *Id.*

138.     That was in violation of the PPP Interim Final Rule, which permits a Borrower to designate the PPP Agent of his choice. It is not up to Lenders to choose which PPP Agents can represent Borrowers.

120.139.     Further, TheFirst asked for another spreadsheet showing how the loan amount had been calculated. *Id.*

31

121.140.     In response, Sport & Wheat complied with TheFirst's request, preparing a new spreadsheet, and making the changes to Borrower I's PPP loan application.

122.141.     As a result of TheFirst's review of the initial PPP loan application submitted by Borrower I, TheFirst knew that Sport & Wheat was acting as Borrower I's PPP Agent in connection with the loan.

123.142.     On April 29, 2020, Borrower I received the PPP loan it had applied for, $7,574.50.

124.143.     Based on the size of this loan, applying the formula in the Paycheck Protection Program, and on information and belief, TheFirst will receive or has received its PPP loan origination fee of $378.73 (5% × $7,574.50).

125.144.     Under the Rule, TheFirst is required to share its fee with Sport & Wheat as Borrower I's PPP Agent, up to the amount of $75.75 (1% × $7,575).

126.145.     Sport & Wheat has not been compensated by TheFirst.

127.146.     In addition to Borrower I, Sport & Wheat has handled and will handle other clients' PPP loan applications for TheFirst. Sport & Wheat expects to be paid for its services in connection with each loan, consistent with law.

32

**Truist**

128.147.    On April 1, 2020, Sport & Wheat was asked by one of its small business clients, "Borrower M," to assist it in applying for a PPP loan. Borrower M provides heating and air conditioning services. It is a Florida corporation with its principal place of business in Milton, Florida. Borrower M has fifteen employees. Due to the pandemic, customers were reluctant to expend funds on replacing air conditioning units, and Borrower M was considering furloughing a number of its workers.

129.148.    Borrower M's primary bank is Truist, and Borrower M hired Sport & Wheat to work with Truist to secure its PPP loan. Accordingly, on April 1, 2020, Jill Sport (a partner in Sport & Wheat) wrote to Truist to say: "Good morning. Under the guidelines released by the Treasury yesterday, we will be acting as [Borrower M's] agent in this process."

130.149.    Sport & Wheat then worked up an application on Truist's forms. It expended 4 hours of time preparing Borrower M's loan application and gathering supporting documents.

131.150.    As with other borrowers, Sport & Wheat also will be required to perform "back-end work" so that this loan is properly forgiven.

33

132.151.    On April 6, 2020, Sport & Wheat uploaded Borrower M's
completed application and supporting documents to the Truist portal. The
application was signed by Sport & Wheat as Borrower M's PPP Agent.

133.152.    In e-mails on April 24, 2020, Truist notified Sport & Wheat that
a certain PPP worksheet had not been properly uploaded into the portal. When
Sport & Wheat asked if Borrower M needed to sign the document, Truist
responded: "You are able to sign as authorized representative[.]" In a further e-mail
that day, Truist wrote to Jill Sport: "Jill - it might be a good idea to log into the
portal and upload on your end the PPP Worksheet." Ms. Sport did so.

134.153.    On April 29, 2020, Sport & Wheat asked Truist what
information it would need in order to compensate Sport & Wheat fees for the work
done as Borrower M's PPP Agent. Truist did not respond. Notably, Truist also did
not disclaim Sport & Wheat's right to a fee, and Truist continued to perform work
on the application.

135.154.    On May 1, 2020, Truist e-mailed Sport & Wheat to say that
Borrower M's loan was approved, but that the worksheet signed by Sport & Wheat
would need to be signed by a Borrower M representative. Truist did not tell Sport &
Wheat that its name would have to be removed. The Truist banker also wrote: "I
also wanted to share that we secured SBA funding for their loan this week. . . . Feel

free to call my cell with any questions." This entire e-mail was with Sport & Wheat. Truist did not even copy Borrower M on the exchange.

136.155.    Truist funded Borrower M's PPP loan on May 7, 2020, in the requested amount of $187,557.

137.156.    Based on the size of this loan, applying the formula in the Paycheck Protection Program, and on information and belief, Truist will receive or has received its PPP loan origination fee of $9,377.85 (5% × $187,557).

138.157.    As with the other loans of this size, that means Sport & Wheat is entitled to a maximum of $1,875.57 (1% × $187,557), which is to come from Truist's fee.

139.158.    On May 8, 2020, Sport & Wheat again inquired about information needed to pay agent fees and was told "[a]t this time we are still awaiting guidance from legal team on approved response and guidance."

140.159.    Sport & Wheat has not been compensated by Truist for its services as Borrower M's PPP Agent.

141.160.    Sport & Wheat construes Truist's silence and stonewalling of its repeated requests for payment as a refusal to carry out its legal obligation to share its fee with Sport & Wheat.

35

142.161.    In addition to Borrower M, Sport & Wheat has assisted and will assist other clients with PPP loan applications through Truist. Sport & Wheat expects to be paid for its services in connection with each loan, consistent with law.

### CLASS ACTION ALLEGATIONS

143.162.    Sport & Wheat brings this action on behalf of itself and a class and subclass of similarly situated businesses. Sport & Wheat seeks class certification under both Fed. R. Civ. P. 23(b)(3) (monetary damages) and Rule 23(b)(2) (injunctive relief).

144.163.    Plaintiff's proposed "National Class" is:

> All persons in the United States who acted as borrowers' agents with respect to a Paycheck Protection Program loan made by any Defendant, and who were not compensated by the Defendant for the work performed.

145.164.    Plaintiff's proposed "Florida Subclass" is:

> All persons in Florida who acted as borrowers' agents with respect to a Paycheck Protection Program loan made by any Defendant, and who were not compensated by the Defendant for the work performed.

146.165.    Throughout this complaint, references to "the class" or "class members" are intended to refer to members of both proposed classes.

147.166.    Excluded from Plaintiff's class definition are: (a) Defendants and any entities in which Defendants have a controlling interest; (b) any entities in

36

which Defendants' officers, directors, or employees are employed and any of the

legal representatives, heirs, successors, or assigns of any of the Defendants; (c) the

judge to whom this case is assigned and any member of the judge's immediate

family and any other judicial officer assigned to this case; and (d) any government

entity.

148.167.    This class is maintainable upon the following grounds.

149.168.    *Numerosity*. FRCP 23(a)(1). The Small Business Administration

has approved millions of PPP loans, and at least hundreds of thousands of those

borrowers relied on the help of PPP Agents. Because Defendants have failed to

compensate PPP Agents as a matter of practice, and due to widespread follow-on

suits in other districts against other lenders after news of this case was published, it

is clear that there are thousands of agents in this class. Joinder of all such PPP

Agents in this action would be impracticable.

150.169.    *Existence and Predominance of Common Questions of Fact and

Law*. FRCP 23(a)(2). There is a well-defined community of interest in questions of

law and fact affecting the class. These questions include the following:

  a. Does the PPP Interim Final Rule provide class members with a
     right to be paid out of Defendants' origination fees?

  b. May Defendants fail or refuse to compensate class members who
     assisted Borrowers in successfully applying for PPP loans?

37

    c. Did Defendants maintain a policy of failing or refusing to pay class members for their services?

    d. Was Defendants' systematic failure or refusal to compensate class members in violation of federal law?

    e. Is class certification appropriate under the circumstances?

    f. Are class members are entitled to damages, and if so, how is that to be determined?

    g. Are class members entitled to declaratory or injunctive relief?

    h. Are Sport & Wheat and the other class members entitled to an award of reasonable attorney's fees, interest, and costs?

~~151.~~170. *Typicality*. FRCP 23(a)(3). Sport & Wheat's claims are typical of the claims of class members. There is nothing unusual about Sport & Wheat's organization or business activities; it is a typical accounting firm like others in the class. Moreover, Sport & Wheat's claims are identical to other class members in that all PPP Lenders have received an origination fee under the same statute and owe a portion of that fee to Sport & Wheat under the same PPP Interim Final Rule, as well as the other class members. The factual and legal bases of Defendants' liability to Sport & Wheat and each class Member are substantially similar. There are no defenses available that are unique to Sport & Wheat.

~~152.~~171. *Adequacy*. FRCP 23(a)(4). Sport & Wheat is an adequate representative of the class. It has diligently pursued its own claims, including filing this action—the first in the country. Moreover, Sport & Wheat is a member of the

38

class and its interests do not conflict with those of other class members. Sport &
Wheat has retained national counsel with substantial experience in litigating
complex individual and class cases, including business cases against large financial
institutions, and counsel have the financial ability to litigate this matter.

153.172.       *Appropriateness of injunctive relief.* FRCP 23(b)(2). Injunctive
relief respecting the class as a whole is appropriate, because Defendants have acted
or failed to act on grounds generally applicable to the class as a whole. Defendants'
refusal to pay PPP Agent fees is a systematic policy of each Defendant, based on a
single statutory/regulatory scheme. Such conduct requires the Court's imposition
of uniform relief to ensure compatible standards of conduct toward the class.

154.173.       *Superiority over other means of resolution.* FRCP 23(b)(3). A class
action awarding money damages is superior to other available methods of resolving
these claims. Chiefly, the amounts owed by each individual Defendant to each class
member are too low to warrant the prosecution of individual actions. Therefore,
most class members could not and would not have redress of the wrongs
complained of, absent a class action. This would result in Defendants' keeping their
ill-gotten gains. Moreover, a multiplicity of suits would congest the courts if class
members did pursue individual claims, and there would be a risk of inconsistent
results. Regarding other "superiority" factors, class members do not have a

significant interest in controlling their own individual claims, because of the same

reasoning: the values may be too low to pursue, and class members' limited time is

better spent on productive work. Regarding the extent of any other litigation, Sport

& Wheat is unaware of any other case involving these particular Defendants.

Regarding the desirability of concentrating claims in one forum, the case presents a

question of uniform federal law. Finally, in terms of likely difficulties of

administration, Sport & Wheat and its counsel feel confident that the Court will be

able to keep this litigation on course as a class action.

155.174.    Class members are also readily ascertainable, because the

Defendants have a record of every loan they have made under the Paycheck

Protection Program. Further, the PPP is only weeks old, so it will not involve a

significant search to identify class members. Defendants also have perfect records

of Borrowers (who are required to repay unforgiven loans) and can locate class

members via that means as well.

**CONSTRUCTION**

156.175.    This complaint should be construed so as to do substantial

justice, and thus the factual allegations above should be considered incorporated

into each count below.

40

157.176.    Further, as the Rules of Civil Procedure permit, the counts below are stated in the alternative. Fed. R. Civ. P. 8(d).

158.177.    References to "Sport & Wheat" below should be construed to include class members as well.

### COUNT 1:
### UNJUST ENRICHMENT
### (Against All Defendants)

159.178.    Sport & Wheat brings this count on its own behalf and on behalf of both the National Class and Florida Subclass.

160.179.    Sport & Wheat performed services for Defendants and their Borrowers.

161.180.    Specifically, as detailed above, Sport & Wheat assisted Defendants by explaining the new Paycheck Protection Program, including the CARES Act and the relevant PPP Rules, to Defendants' own customers, the Borrowers. Sport & Wheat also worked with Borrowers to assemble the relevant documents and information, drafted loan applications on Defendants' own forms, and packaged and submitted these materials to Defendants. In some cases, Sport & Wheat affirmatively responded to the Defendants' requests for information.

162.181.     All of Sport & Wheat's conduct, as described in this count, benefited each of the Defendants, by bringing completed loan packages to Defendants' banks, earning them origination fees.

163.182.     With respect to each loan issued, Defendants performed less work than they would have, absent Sport & Wheat's involvement. The details of this assistance with respect to some banks are discussed in the allegations above pertinent to each bank.

164.183.     Defendants benefited from Sport & Wheat's help.

165.184.     Defendants knew of the services Sport & Wheat was providing as a PPP Agent to Defendants' Borrowers. Defendants knew of the value of those services. And Defendants knew of Sport & Wheat's expectation of being compensated, both as required by the PPP Interim Final Rule as well as through Sport & Wheat's contact with each Defendant.

166.185.     Defendants accepted Plaintiff's services and retained the benefit of those services.

167.186.     Defendants themselves earned substantial origination fees from the SBA for issuing PPP loans.

168.187.     But Defendants retained all of those fees for themselves, including the portion of those fees that are owed to class members.

169.188.    Defendants have been unjustly enriched as a result.

170.189.    Under the circumstances, it would be inequitable for

Defendants to retain all of the PPP loan origination fees paid to Defendants by the

SBA, without paying Sport & Wheat for its services as a PPP Agent.

171.190.    Defendants are liable to Sport & Wheat and class members in

the amounts they unjustly retained.

## COUNT 2:
## CONTRACT IMPLIED IN LAW (RESTITUTION/QUASI-CONTRACT)
### (Against All Defendants)

172.191.    Sport & Wheat brings this count on its own behalf and on behalf

of the National Class and Florida Subclass.

173.192.    Sport & Wheat conferred a benefit on each Defendant. It did

so—at a minimum—by performing work which Defendants did not do, by bringing

completed loan applications to Defendants on behalf of Borrowers, and by making

it easier and faster for Defendants to process loans.

174.193.    Each Defendant was aware of the benefit Sport & Wheat

conferred on it, because each Defendant knew that Sport & Wheat was a part of

each loan transaction in this action. In fact, as pled, certain Defendants even

affirmatively requested further assistance from Sport & Wheat in connection with

various transactions.

43

175.194.    Defendants earned the origination fee from the Small Business

Administration, set in the Paycheck Protection Program statute, and did so with

Sport & Wheat's help.

176.195.    Accordingly, Sport & Wheat conferred a benefit on each

Defendant.

177.196.    Each Defendant has failed or refused to pay Sport & Wheat for

its work.

178.197.    For all the reasons set out in this complaint, it would be

inequitable for Defendants to retain these benefits under the circumstances.

179.198.    Defendants wrongfully retained the benefits conferred on them

by Sport & Wheat.

180.199.    Defendants are liable to Sport & Wheat and class members in

the amounts of the benefits conferred on them.

### COUNT 3:
### CONVERSION
### (Against All Defendants)

181.200.    Sport & Wheat brings this count on its own behalf and on behalf

of the National Class and Florida Subclass.

182.201.    A portion of the origination fee each Defendant received was

the rightful property of Sport & Wheat.

44

183.202.   Defendants' interference with, and dominion and authority over, Sport & Wheat's property, is an overt act that is inconsistent with Sport & Wheat's rights.

184.203.   Accordingly, Defendants are liable to Sport & Wheat and class members for conversion in the amount of the fees they have tortiously retained.

## COUNT 4:
## DECLARATORY RELIEF
### (Against All Defendants)

185.   Sport & Wheat brings this count on its own behalf and on behalf of the National Class and Florida Subclass.

186.   The Declaratory Judgment Act, 28 U.S.C. § 2201(a), permits the Court to declare the rights of a party in a decree that has the force and effect of a final judgment.

187.   Defendants have asserted that Sport & Wheat is not entitled to a fee for the work it performed.

188.   Sport & Wheat seeks a declaration that, because it performed work for Borrowers, it is entitled to fees, to be paid from Defendants' origination fees under the Paycheck Protection Program.

189.   Sport & Wheat also seeks a declaration that Defendants acted unlawfully, in refusing to maintain Sport & Wheat's name as PPP Agent on loan

~~applications and documents filed with the Small Business Administration.~~

~~Defendants' conduct was unlawful in that it ran afoul of the PPP Interim Final~~

~~Rule.~~

**PRAYER FOR RELIEF**

Sport & Wheat demands a judgment against each of the Defendants. Sport & Wheat demands, as pled in the alternative, Fed. R. Civ. P. 8(a)(3), the maximum of all of the following:

a. Compensatory damages, injunctive relief, restitution, disgorgement, *quantum meruit* damages, declaratory relief, and all other relief allowed by law or equity.

b. An injunction requiring each Defendant to take any step necessary to permit Sport & Wheat and the class to be lawfully paid under law, including, but not limited to: retroactively amend and re-process any loan application; notify the Small Business Administration of a plaintiff's participation in a transaction as required by law; and other steps deemed necessary by the Court.

c. An injunction barring each Defendant from refusing to allow future Borrowers to have their PPP Agents paid out of origination fees paid to lenders under the Paycheck Protection Program.

d. All costs of suit and attorney fees.

e. Pre-judgment interest and post-judgment interest.

f. Any other relief the Court deems fair.

g. An order certifying the class, appointing Sport & Wheat as class representative, and appointing Sport & Wheat's counsel as class counsel for the class.

46

h. The costs of notifying the class that a class action has been certified.

## JURY DEMAND

Sport & Wheat demands a trial by jury on any issue triable of right by a jury.

Dated: ~~May 27~~August 31, 2020     Respectfully submitted,

> **Formatted:** Font: Times New Roman

/s/ ~~Virginia M. Buchanan~~William F. Cash III

> **Formatted:** Font: Times New Roman

Virginia M. Buchanan
   (Fla. Bar No. 793116)
Matthew D. Schultz (Fla. Bar No. 640328)
William F. Cash III (Fla. Bar No. 68443)
**LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY & PROCTOR, P.A.**
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Phone: 850-435-7059
Email: bcash@levinlaw.com

/s/ John S. Wirt

John S. Wirt, Esq. (Fla. Bar No. 117640)
Pamela Cocalas Wirt, Esq. (Fla. Bar No. 109576)
**WIRT & WIRT, P.A.**
5 Calhoun Ave, Suite 306
Destin, FL 32541
Tel: 847-323-4082
Fax: 314-431-6920
jwirt@wirtlawfirm.com

> **Formatted:** Font: Times New Roman

*Attorneys for the Plaintiff*

> **Formatted:** Font: Times New Roman

47